BYBEE, &c.
*vs*
THARP AND WIFE.

*October* 31.

---

## Bybee, &c. *vs* Tharp and wife.

ERROR TO THE JESSAMINE CIRCUIT.

*Guardian. Interest. Husband and wife. Release.*

JUDGE MARSHALL delivered the opinion of the Court.

THIS writ of error is prosecuted to reverse a decree for $5506 71, rendered against Bybee and others, his sureties in bond for the performance of his duties as guardian of Mrs. Tharp, formerly Sarah Anne Roane, and a decree over for the same sum, in favor of two of said sureties against Adair and Bridges, who had entered into a covenant to indemnify them against their said suretyship, in consideration of their releasing a mortgage which Bybee had executed to them for the same purpose.

It seems that in 1822, Bybee intermarried with Mrs. Roane, the mother of Sarah Anne, and in January, 1823, was appointed guardian of the latter, then about seven years of age; that by the end of that year, in virtue of his marriage and guardianship, he became possessed of a large number of slaves, of both sexes and of all ages and descriptions, which had been conveyed, in trust, for the

COVENANT.

*Case* 59.

*October* 24.
Case stated.

BYBEE, &c.
*vs*
THARP AND WIFE.

benefit of his wife and ward, by the former husband of Mrs. Bybee, and also of the notes taken and money received by the Trustee, for the hire of the year 1823, and also, about the same time, of three slaves, a bed and a horse, bequeathed to his ward by her aunt; and that on his marriage he took possession of the household furniture in the house of his wife, which is now alledged to have been covered by the deed of trust. The ward continued to live in the house with her step-father and guardian until her marriage, in July, 1833, with A. W. Trapnall. The slaves also, with few exceptions, remained in Bybee's possession until after that time, many of them having been employed by him in a bagging factory, from the year 1825 or 1826. There was no division of the slaves until 1827, when a suit in Chancery, brought to set aside the deed of trust, by Bybee and wife, the latter of whom claimed the slaves under a will of her deceased husband, was decided against them.

It further appears, that during the period of more than ten years, that the ward lived with her step-father, the mutual affection and confidence commonly belonging to the relation of parent and child was strongly felt and displayed between them; that Bybee took great pains to give to his ward the mental and personal accomplishments befitting her fortune and family; that he devoted his own time and attention to her education; employed private teachers, and occasionally, though but for a short period, sent her to distant schools; that the ward, as she grew to womanhood, displayed talents and great susceptibility of improvement, with a disposition wayward, but liberal, generous and leading to extravagance, which it was difficult, if not impossible absolutely to restrain, without a rupture, and without injury to the ward and offence to her family, and which was indulged by her guardian to an extent beyond the limits of prudence.

In March, 1833, Bybee having never, until that time, made report to the County Court, of the estate of his ward, and having neglected to keep an account of its management or of her expenses, (in neglecting which duties he was guilty of an unpardonable and most dangerous fault,) made a settlement of his accounts as guar-

dian, with four Commissioners, appointed for the purpose by the County Court, and which was intended to cover all his transactions in that character, from the time of his appointment up to the 1st of January, 1833. The Commissioners had resided, during that period, in the same town, or its immediate vicinity, in which Bybee and his ward had lived ; they had a general knowledge of the slaves of the ward, and of the value of hire in that neighborhood, and upon this knowledge and the information of Bybee as to age, capacity and other circumstances affecting the charge, they charged him what they considered to be a reasonable annual hire for the slaves, making allowance for the care of such as were unable to maintain themselves. They knew also the manner in which the ward had been treated in the house of her guardian and her mother; how she had been educated, and how she had appeared in society, and upon this knowledge they estimated the reasonable expense of her maintenance and education for the first four or five years, and for the residue of the time, allowed such additional accounts of articles purchased by and for her, as she then, an intelligent young lady of 17 or 18 years of age, indorsed as being correct. They allowed also the half of certain payments made by Bybee, of debts affecting jointly his own and his ward's estate, and also travelling expenses incurred about her education or in her visiting, and one half of travelling expenses and other costs incurred about the defence of suits affecting equally the estate of both. The account made up in this manner, and of which the basis is stated in their report, exhibits a balance in favor of Bybee of $1699 94, all of which, except $524 50, alledged to be the actual expenditure of money on account of the ward's estate, the report says he released, on condition that no attempt should be thereafter made "to repress that account and seek a settlement of the same upon technical rather than liberal and just principles." And the report expresses the opinion of the Commissioners, as founded on their personal observation of the liberal manner in which the ward was supplied, that in relying upon estimates for the earlier part

of the account, they have rather fallen short of the fact than exceeded it.

On the 4th of July following this settlement, which was approved by the Court, Sarah Anne Roane was married to A. W. Trapnall, then about twenty-three years of age, a young lawyer of intelligence and capacity, who had been raised and had lived, until a few months before, in the immediate vicinity of Bybee, and having, as may be presumed, a general knowledge of the habits of the ward, and of the indulgence extended to her, and also of the condition and quality of her estate. He, some short time after his marriage, examined the settlement at the office in which it was recorded, obtained a copy of it, and upon such consideration and inquiry as he deemed satisfactory, and doubtless upon consultation with his wife and a communication of all facts within her knowledge, and after stating to one witness that he had examined the subject and was satisfied, acknowledged, in the office of the same Clerk, and deposited for record therein, a writing, under his hand and seal, importing, that having examined the settlement of accounts, (which is particularly described,) he *admitted said account as completely satisfactory.* This instrument bears date on the 14th of August, 1833; about the same time Trapnall executed a deed of trust, conveying all the slaves, with one or two exceptions, to Bybee and another, in trust, for the wife of the grantor, and in a year or two after died.

*The object of complainant's bill.*

In 1837, the widow of Trapnall having intermarried with Tharp, who afterwards took administration on the estate of Trapnall, this bill was filed by them to impeach the settlement and have a re-settlement of the account. They charge that the settlement was unfair; that many items were omitted with which Bybee should have been charged; that the hire charged against him was too little, and the credits allowed too great, and many of them unfounded.

*The defence relied on.*

The defendants relied upon the various circumstances which have been stated, and particularly upon the effect of the instrument executed by Trapnall, as above mentioned, and Bybee insisted that he had acted faithfully as guardian.

But the Court, disregarding that instrument and being of opinion that Bybee had grossly violated his duties as guardian, directed an account to be taken upon the most rigid principles, rejecting, especially, all claims for personal expenses, &c. requiring proof or regular vouchers for all credits claimed; disallowing all "extraordinary or unreasonable expenditures;" directing an estimate of the proper allowance for maintenance and education of the ward, according to her fortune and rank, and charging interest on all property or money not accounted for, from the time when received, and on cash notes from the time when due, and directing that interest should be made principal at the end of every two years: but making no reference to the cost or trouble of maintaining infant, infirm or superannuated slaves.   The report of the Auditor goes even beyond the decree in severity since it charges interest on the value of one half of the household furniture from the time of Bybee's marriage, nearly a year before he became guardian, and makes the interest on the hire of the first and of every alternate year become principal and bear interest at the end of one instead of two years from the time it became due.   The interest alone, charged against Bybee in this account, amounts to $2530 77.   There are, in fact, but two new items ·of charge, (except the interest,) introduced into this account, viz: one half of the household furniture, valued at $196 50, and the bed and horse before mentioned, valued at $75; and yet upon this additional basis to commence with, by introducing interest and compound interest, by increasing the annual charges for slave hire, upon evidence taken long after the County Court settlement, and without allowing for the maintenance of the old, and the young, and the infirm, by allowing an average of the estimate of witnesses, a fixed sum for the maintenance and education of the ward, proportioned to her increasing age, but without regard to the actual expenditures as evidenced by the admitted accounts accompanying the former report, and thus rejecting particular items of expense to the amount of about $2000, over and above the general allowance for board and tuition in the former settlement, a change is produced in the balance, from about $1700 in favor of

A guardian
should not be
subjected to in-
terest on the hire
of slaves in one
year after it falls
due, as on mon-
ey.

Bybee, to about $3600 against him, on the 1st of Janu-ary, 1833, increased by interest and hire for that year, to $4577 90, on the 1st of January, 1834; and being then reduced to $4049 07, by credits then applied, without interest, for expenses, most of which, if not all, had been incurred years before, is again swelled, by interest, to $5506 07, as being due on the 1st of January, 1840; for which sum, with interest from the last named day, the decree was rendered.

If this decree and report had come before us unaffected by the former settlement as ratified by Trapnell, we could not have hesitated to send back the case for a re-adjust-ment of the accounts upon principles more equitable and more applicable to the circumstances of the case than those which characterize the interlocutory decree and re-port of the Auditors: 1st. Too much interest is charged. The principle of biennial rests, as heretofore adopted in regard to money funds, does not seem to sanction the compounding of interest upon slave hire at the end of one year after it falls due, and especially when, although the expenditures on the other side may be accruing frequently during the year, the aggregate of each years' expenses is only credited at the end of the year without intermediate interest. 2d. No interest should have been charged upon the value of the household furniture found by Bybee in his wife's house when he married her, nor upon the bed and horse left to his ward by her aunt. It is not absolutely certain, tho' probable, that this identical furniture was in existence when Roane's deed of trust was made, which con-veys all his property, describing the land and slaves, but not mentioning the furniture. It is of course by no means certain that Bybee, finding the furniture in the house of Mrs. Roane four years after the death of her first husband, and six years after the date of the deed, knew that it was embraced therein. But even if he did know it, or wheth-er he knew it had been left there for her comfort by the Trustee, or supposed it had been purchased out of the profits of the estate for the same purpose, he was under no obligation to sell one half of it as the property of the ward, any more than he was to sell one half of the slaves. The furniture was left or placed there by the Trustee to

BYBEE, &c.
*vs*
THARP AND WIFE.

be used as furniture for the joint benefit of mother and child, and there was no propriety in selling one half of it for the separate use of the child so long as she continued with her mother, unless it had been necessary for her proper support and education. The utmost obligation of Bybee seems to have been to have given her one half of its original value when she left the house or ceased to be his ward, or to have then made a specific division, if she desired it, compensating her for the deterioration by use; and so as to the bed and horse. They certainly were not left by the aunt to her niece for the mere purpose of being sold, but for the purpose, (at least if her friends should think proper,) of being kept and used by her as the gift of her aunt. It was not necessary to sell either for her support. The bed, as may be inferred, was in fact kept and sent to her residence after her marriage; and if there should be any charge for either, it could only be for the horse, as to which we think there is an intimation that it was, at some time, sold for fifteen dollars; and yet these items, which, as already stated, are the only new charges, except interest, introduced into the account, must, by interest and compound interest, have swelled in the result to between $700 and $1000. 3d. The charges of hire for 1823 and 1824 are based upon a calculation of the money and notes for hire, handed over by the Trustee to Bybee at the end of the year 1823, which are taken as the criterion of the hire for both years; and although the aggregate amount was only $700, payable, as the Trustee himself states, in Commonwealth's Bank notes, then worth but fifty per cent. of their nominal amount, so that one half of the aggregate hire for each year, chargeable to Bybee as the share of his ward, was only $175 in specie; yet the report, by failing to reduce some of the fund to specie, charges him with about $275 for each year, and this excess, with its simple and compound interest, enters into the final aggregate. The explanation here given of this item shows that the notes and money handed over by the Trustee do not, as has been contended, form a distinct charge in addition to the hire of 1823, but that they constituted that hire; and as the County Court Commissioners charged the hire of that year at $155, only

$20 less than the Auditors should have charged on the data assumed by them, and as this difference may be accounted for by the allowance made in the former account for taking care of slaves not hired, or by the supposition that the Commissioners estimated the hire only of those slaves which had been allotted to the ward, there is no ground for imputing to Bybee any suppression of proper debits in reference to this part of the subject.

4th. The charges for hire for the succeeding years, though not greater than the estimates of some of the witnesses would authorize, is greatly beyond the estimate of other witnesses, which approximates to the charges as made by the County Court Commissioners, and may perhaps justify them, after making the allowance just referred to. But the charge in the report is too high, because no such allowance is made, and because the advantage of having the slaves all kept together under the care of the ward, mother and guardian, who was a physician, should be deemed some compensation for not making the utmost that might possibly have been made by hiring every one that could be hired, whatever might be his or her condition: and the report and decree are erroneous in charging against Bybee, as guardian, and thus against his sureties, so much of the hire for the year 1833 as accrued after Trapnall assumed the control of the slaves by conveying them to Trustees. After that, Bybee, who had not hired them for the year, but was chargeable because he retained them in possession, held them under Trapnall's conveyance, and not as guardian.

5th. The interlocutory decree and report are wrong in principle, in respect to the ascertainment of credits to be allowed for expenditures, not only in regard to travelling expenses incurred in defending suits, but more especially as to expenses incurred in the maintenance, education, accomplishment and personal enjoyments and gratification of the ward. The law will not allow the guardian, but at his own peril, to expend upon the ward more than the income of his or her estate, allowing him, however, to look to future years for remuneration as to any casual excess. The Chancellor might, perhaps, interfere to prevent an unnecessary encroachment on the principal. He

*A guardian should not expend upon his ward more than the yearly profits of the ward's estate, without permission of the Chancellor, tho' he may look to future years to supply a casual excess,*

has interfered in England to compel an appropriation from the principal where it was necessary for the suitable maintenance and education of the ward.

It must certainly be a strong case of wasteful extravagance which would authorize an interference to prevent such expenditures upon the dress or for the innocent gratification of a female ward, or for taking her into society suitable to her fortunè and connections, as are made under the sanction of her nearest friends, without infringing upon the principal of her estate; and it would seem to require a still stronger case to justify a Chancellor, after expenditures of this sort had been made upon a female ward, with the sanction of her mother and her step-father and guardian, to hold the latter, or as in this case, his secureties, liable if those expenditures, though they have not touched the principal of her estate, should be deemed extraordinary or unreasonable by the Chancellor or his Auditors. We know of no established criterion as to what should be deemed extraordinary or unreasonable, that would require, in this case, so heavy a penalty to be inflicted upon the guardian or his sureties, as to make them pay the ward or her husband for articles or money with which he has actually furnished her, and for which she was able to pay out of her income. There is no ground in this case for charging bad faith or flagrant waste in the expenditure of money upon the ward, and, therefore the question should have been, what was the amount expended, and not how little might have been made to do.

The neglect of Bybee to keep a regular account and make regular settlements, though a serious fault for which his sureties would probably have suffered severley, if they had nothing to rely on but the general evidence in this cause, is not such an offence as to place him or them out of the protection of equity and justice, or to allow charges to be heaped upon him, and credits to be denied upon mere color of plausibility. We repeat, therefore, that if this case had come up unaffected by the previous settlement and ratification, we should have sent it back for a re-adjustment of the account: but it does not come in that way, and the question is, how far the former settlement

The Chancellor would require a strong case to be made out to induce his interference to restrain a guardian in the expenditure upon the education, &c. of a ward, which was within the profits of the estate and sanctioned by the friends and nearest relations of the ward.—

—And a still stronger case to render sureties of a guardian responsible after such expenditures had been made with the sanction of a mother, &c.

and the ratification of it by the husband of the ward should affect the present case? Do they, to any extent, preclude a further inquiry into the accounts and transactions of the guardian during the period to which they refer, and if so how far? Whatever effect they may properly have in law or equity, they ought to have in this case, since the two counter securities, Adair and Bridges, upon whom the burthen of any decree against Bybee and his sureties must ultimately fall, entered into their covenant of indemnity after the settlement was approved by the Court and ratified by Trapnall.

The County Court settlement, if it stood alone, would certainly be liable to be surcharged and falsified, both by impeachment of the items of debit and credit which it contains, and by showing that there are other proper debits which were not brought into it. The attempt is made to impeach it *in toto*, as unfairly made. But in this we think the complainants have wholly failed. No unfair means seem to have been used to obtain the certificate of the ward, as to the correctness of the several accounts allowed against her. There is no reason to suppose that though inclined even to sacrifice her interest to benefit her guardian, then in laboring circumstances, she would have been willing or was induced to sacrifice the truth for that purpose. The accounts admitted by her have not been disproved: and their verity receives strong confirmation from the fact that her husband, who never was the ward of Bybee, expressed, in the most solemn manner, his approval of the settlement. As to other allowances made upon the estimate of the Commissioners, they are not materially variant from those made by the Auditor; and though the charges for hire of slaves must be deemed very low, even after making the allowances before adverted to, yet they, as well as the settlement in general, are supported by the testimony of three of the Commissioners deposing as witnesses; and they are, probably, not materially variant from the estimates of several of the other witnesses. But conceding that on this point the weight of testimony now offered preponderates strongly against the settlement, and conceding, what indeed appears on the face of the report, that the

'Commissioners were not governed, by strict legal principles, but did what, under the circumstances of the case and upon their own knowledge and observation they thought was just and right, they, nevertheless, acted on their own judgment and estimate as to the value of the hire, subject to such deductions as they thought just, and their estimate and settlement is not to be disregarded. But Trapnall, though apprised by the report itself, that it might be asserted as not technically sufficient, though believed to be just, and after deliberate investigation of the subject, admitted it to be satisfactory. Suppose the settlement had taken place after his marriage, and he had been personally present as a party to it, and had admitted in Court, or even before the Commissioners, that he was satisfied that it was correct, and had acquiesced in its approval, would not he and his wife, in case of her surviving him, or his administrator, have been completely estopped from questioning it afterwards, except upon the ground of fraud? We cannot doubt that this would have been the effect of such an act, and we cannot give any less effect to the solemn acknowledgment which he did make, and which, from the manner in which it was made, must have been intended as a perpetual and conclusive evidence of his confirmation of the settlement. Whatever right his wife might have had before marriage, to demand a settlement and a payment of any balance, or whatever right of survivorship she may have had, the husband had a complete right to bar by his act.

A man may bar his wife's right of survivorship to her *choses in action* by a release: (*Clancey on Rights*, 111.) A man may discharge any debt due or any wrong done to his wife before or after marriage: (*Shepherd's Touchstone*, 333.) The husband's release of his wife's debt, due before coverture, is good: (*Roll. Abr. Release D.*) The husband, therefore, in this case, had power over the whole subject. He had power, in the name of himself and wife, to call upon the guardian, by suit, for another settlement. He had power to make the settlement himself; to receive the whole or any part in the name of the whole demand, or to release or discharge the money due to his wife, or the wrong done to her by a wrongful settle-

Husband may release the wife's right by survivorship to a *chose in action*: (*Clancey on Rights*, 111;) may discharge a debt due, or release any wrong done to the wife before coverture: (*Shep. Touchstone*, 333,) or make a settlement with the guardian of the wife; or approve a settlement made, or release any wrong done to her in such

Bybee, &c.
vs
Tharp and wife.

settlement, and
bar her right of
survivorship, un-
less there be
fraud or mistake.

ment; and if he is bound she is bound. Would not an acknowledgment, under seal, that his wife's demand had been paid to him be a complete discharge? Or his acknowledgment that he had received all but a certain sum, or that upon settlement he found nothing due, or that on settlement he found his wife indebted so much, which he bound himself to pay? Are not all these acts essentially the same to the extent of the acknowledgment? Do they not, to that extent, appropriate any right which the wife had, and extinguish it to the extent that satisfaction is acknowledged? Suppose a husband assume to settle an account existing between his wife and a third person, and finding a balance in her favor, takes a bond for it, payable to himself, is not her right forever gone? And is not the case the same, if finding the balance against her he assume to pay it?

We think, that by taking up the settlement, investigating the subject, and executing the instrument in question, and ordering it to be recorded, he did, in the most emphatic manner, make himself a party to the settlement, assume the control of his wife's interest in the subject, and appropriate it to himself as his own, and that by the acknowledgment of a balance against her, which he of course was bound to pay, he not only acknowledged the correctness of all matters appearing on the account, but, in effect, acknowledged satisfaction of all demands arising therefrom, and therefore, discharged and released all such demands, just as other parties making a settlement of accounts and acknowledging, under seal, a stated balance to be correct, do thereby mutually discharge and release all demands on account of the matters included in the settlement, except for the balance acknowledged. And as such a settlement would be a bar, in other cases, to any such demand, except on the ground of fraud or mistake, so in this case the instrument in question is a bar, except on the ground of fraud or mistake, to any demand for matters appearing in the settlement, which Trapnall has acknowledged to be correct, or whether correct or not, to be satisfactory, and therefore, binding on him.

But the proof now adduced, that the estimate which the Commissioners made of the hire of the slaves was

lower than others would have made or now make, or that their allowance for expenditures was too great, does not establish either fraud or mistake. 'Trapnall must be presumed either to have made such inquiries as satisfied himself on these subjects, or else from a concurrence with the wishes of his wife, to have preferred a sacrifice of possible gain rather than to have commenced a litigation with her step-father, already embarrassed in his circumstances. Whether, upon such information as he deemed satisfactory, he regarded the success of such a litigation as hopeless or doubtful or certain, the avoidance of it, with a release of a large portion of the balance appearing against his wife on the settlement, formed a sufficient consideration for his approval of it, and his relinquishment of all right to contest it, it does not appear that Bybee interfered in any manner, to influence this determination. The fair inference is, that Trapnall became satisfied that the settlement was substantially just and correct, and this was certainly a sufficient consideration for relinquishing any legal advantage; or if, without inquiring into facts, he yielded to the gratitude and affection of his wife for her guardian, and to her repugnance to disturbing the harmony of the family, surely such a motive could not have diminished the efficacy of his act; and the right, once gone by his ratification of the settlement, could not be regained by a change of feeling, either on his part or hers; nor should either of them be allowed to aver that an act of this character, which may have induced Bybee's sureties to give up their indemnity, or have induced others to become bound, was done without consideration.

We are of opinion, therefore, that neither Trapnall nor his administrator, nor his wife surviving him, can impeach this settlement, except on the ground of fraud or mistake on the part of Bybee, in withholding or suppressing charges against himself, which were, therefore, not brought into the account; and that, even on this ground, they could not impeach it with any advantage to themselves, unless the omitted items should, when introduced into the account as settled by the Commissioners, either change the balance or reduce it below the amount released by Bybee. We have already noticed the new items

BYBEE, &c.
vs
THARP AND WIFE.

—But proof that hire of slaves allowed by Commissioners was less than an auditor or witnesses before him think they were worth, does not prove fraud or mistake.

HARVARD LAW SCHOOL LIBRARY

introduced into the Auditor's report, and it is manifest that they could not, even in conjunction with any allowable increase of the charge for hire, previous to the division of slaves in 1827, amount to any thing like the sum released by Bybee. This fact, as well as what was before said with regard to the omitted items, negative any presumption of fraud on the part of Bybee, in not having them set down in the account; we suppose, in fact, he had never thought of being liable for the furniture. With regard to the hire for 1833, not included in the County Court settlement, the sum claimed by Bybee out of the acknowledged balance in his favor on that settlement, together with the expenses of the ward during the year 1833, up to her marriage, are more than sufficient to cover the hire up to the time of executing the deed of trust, when Bybee's liability as guardian ceased.

We are of opinion, therefore, that neither Tharp and wife, in right of the latter, nor Tharp, as administrator of Trapnall, have shown any sufficient ground for overturning the County Court settlement, as confirmed and ratified by Trapnall; nor any ground for equitable relief against the defendants to their bill; and this conclusion takes away the equity set up by Haggin and Williams against Adair and Bridges, on their contract of indemnity. Therefore, the decree, both upon the original and cross bills, is reversed; and the cause is remanded, with directions to dismiss each of said bills with costs.

*Owsley & Goodloe and Robertson* for plaintiffs: *Harlan & Craddock and Loughborough* for defendants.